UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

———

DEJI KENYATTA LEE,

                    Petitioner,                   Case No. 5:05-cv-44

v.                                       Honorable Wendell A. Miles

PAUL RENICO,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C.
§ 2254. Petitioner is serving a term of 1 year to 7 1/2 years' imprisonment, imposed by the Eaton
County Circuit Court on January 31, 2002, after a jury convicted him on one count of failure to
return rental property worth between $1,000 and $20,000, MICH. COMP. LAWS § 750.362a(3)(a). In
addition to incarceration, the circuit court ordered Petitioner to pay $5,630 in restitution.[1] In his *pro
se* petition, Petitioner raises three grounds for habeas relief, as follows:

> I.      Petitioner was denied a fair trial due to prosecutorial
> misconduct because the prosecutor: (a) denigrated Petitioner,
> (b) made materially false and inflammatory remarks, (c)
> vouched for the credibility of prosecution witnesses, and (d)
> stated his personal opinion regarding Petitioner's guilt.

---

[1] Petitioner is also presently serving sentences imposed by the Ingham County Circuit Court in 2001 for
convictions on one count each of armed robbery (9 to 20 years' incarceration); assault with intent to commit great bodily
harm less than murder (4 to 10 years); carrying a concealed weapon (2 to 5 years); and possession of a firearm in the
commission of a felony (2 years). It appears that Petitioner is serving these sentences concurrently with the Eaton County
sentence he challenges here. (Sentencing Tr., 4, 15, 20, docket #17; J. of Sentence, p. 1 ¶ 5, docket #18.) I conclude,
however, that, despite the fact he is serving his sentences concurrently, the "concurrent sentence doctrine" does not bar
this court's review of Petitioner's habeas claims because he was ordered to pay restitution on the failure to return
property conviction. *See United States v. Ware,* 282 F.3d 902, 906 (6th Cir. 2002); *Dale v. Haeberlin*, 878 F.2d 930,
935 n.3 (6th Cir. 1989).

II.     Petitioner was denied a fair trial because the prosecution failed to exercise the procedure of due diligence.

III.    Petitioner was denied a fair trial because his conviction was obtained by an erroneous assessment by the trial court which resulted in a manifest constitutional error that lead to a miscarriage of justice.

(Pet. Atts. A-D, docket #1; Pet'r Mem., ii, 2, docket #2.)  Respondent filed an answer to the petition

(docket #11) stating that the grounds should be denied.  Upon review and applying the standards of

the Antiterrorism and Effective Death Penalty Act, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I

find that Ground I is without merit, and Grounds II and III are both unexhausted and furthermore

without merit.  Accordingly, I recommend that the petition be denied.

## Procedural History

### A.     Trial Court Proceedings

The state prosecution arose from Petitioner's failure to return a rented 2000 Pontiac

Grand Am to a Lansing Enterprise Rent-A-Car in June 2000.  Petitioner was charged with failing

to return rental property worth between $1,000 and $20,000.  (Trial Tr. vol. I, 9, 12-13, docket #15.)

He was tried before a jury on December 17-18, 2001.

Angie Makowski testified as follows.  In May and June 2000, she worked as the

branch manager of the Enterprise Rent-A-Car on Saginaw Street in Eaton County.  (Tr. I, 80, 110,

113.)  Makowski encountered Petitioner a number of times beginning in May 2000 when he came

to Enterprise four to five times to renew a pre-existing contract and exchange vehicles.  (Tr. I, 82-83,

108-10.)  Petitioner could walk[2] at the time Makowski met him, and looked "clean-cut."  (Tr. I, 97,

109.)  On June 2, 2000, Petitioner came in to Enterprise and renewed an existing contract for the

---

[2] The significance of this will become clear.

rental of a 2000 Pontiac Grand Am.  (Tr. I, 80-81, 83-84, 86.)  Under the contract, Petitioner was required to return the vehicle around June 12 or 18, 2000.  (Tr. I, 85, 111.)  When Petitioner did not return the vehicle in June 2000, Makowski talked to Petitioner between 50 and 100 times on the telephone, telling him he would have to either pay to extend the contract or return the car.  (Tr. I, 89-90, 110, 113.)  Petitioner told Makowski that he had rented the car in his capacity as a union representative for Meijer Corporation, and that the company was taking a long time to cut a check to renew the rental.  (Tr. I, 90.)  Makowski charged Petitioner's credit card on file to the point where it reached its maximum charge.  (Tr. I, 90-91.)  Makowski also went to some of Petitioner's listed addresses to try to find Petitioner and/or the vehicle.  (Tr. I, 91, 106.)  Enterprise sent Petitioner a demand letter via certified mail threatening to report his failure to return the car if it was not returned by October 4, 2001.  (Tr. I, 92.)  Petitioner was angered by this, and had someone posing as a representative from Meijer call Makowski and tell her she would soon receive payment to extend the rental.  (Tr. I, 93-94.)  Makowski subsequently discovered Petitioner was not in fact a union representative for Meijer.  (Tr. I, 94.)  Makowski never received payment for the car.  (Tr. I, 94.)

Makowski further testified that some time later she received a call from police who had found a car and taken it to a police impound lot.  (Tr. I, 95.)  Makowski examined the car and determined it was the car Petitioner had rented from Enterprise.  (Tr. I, 95.)  The vehicle identification number (VIN) on the car matched that of the car Petitioner had rented, but the license plate did not.  (Tr. I, 96, 103-04.)  Makowski drove the car back to the Enterprise branch.  (Tr. I, 103.)  Enterprise lost a total of $8,321.17 – a combination of loss of use and loss of rental income – in its transaction with Petitioner.  (Tr. I, 96-97.)  Makowski reported the incident to police.  (Tr. I, 97.)

On cross-examination, Makowski admitted that she was not present at the initial rental of the vehicle under Petitioner's name because she first met Petitioner when he came to Enterprise to renew an existing contract in May 2000; and that her assistant manager had likely executed the initial contract. (Tr. I, 113-14.)

Lansing Police Department Officer Dennis Bunch testified as follows. In January 2001, he was working as a patrol officer and participated in arresting Petitioner at the Lansing Credit Union because employees there had been instructed to call police if Petitioner tried to transact business there. (Tr. I, 116-17, 119, 126-27.) Petitioner was in the bank's drive-through lane in a silver Pontiac Grand Am. (Tr. I, 117-19.) The VIN on the Grand Am matched that of the car Petitioner had most recently leased from Enterprise. (Tr. I, 84-89, 118.) Bunch leaned into the passenger side of the Grand Am to try to get Petitioner out of the car and into custody. (Tr. I, 120, 128.) Petitioner pressed on the gas, crashed through a snow bank, and fled down Lake Lansing Road. (Tr. I, 121.) Officers pursued Petitioner but lost him near Saginaw Street, so they looked for the vehicle. (Tr. I, 121-23.) Police apprehended Petitioner on foot 15 to 20 minutes later nearby, and found the vehicle blocks away on Detroit Street. (Tr. I, 123-24, 131-32.) Bunch saw the vehicle at Detroit Street; another officer ran the VIN and license plate numbers through a database. (Tr. I, 125-26.) Other officers instructed Bunch that there was an "improper" license plate on the vehicle and that the vehicle had been reported stolen from Eaton County. (Tr. I, 126-27.)

On cross-examination, Officer Bunch admitted that while he was leaning into the front seat of the Grand Am at the credit union, things were hectic because he was very "busy"; he was looking at the driver's hands for a weapon; and the driver of the vehicle was only stopped for

about 10-15 seconds before he sped away.  (Tr. I, 129.)  Officer Bunch never asked the credit union teller the identity of the Grand Am driver.  (Tr. I, 129-30.)

Lansing Police Department K-9 Officer Mark McAleer testified as follows.   On January 4, 2001, McAleer was dispatched to Lake Lansing Road as back up because Petitioner was believed to be at the credit union there.  (Tr. I, 134, 137, 152.)  McAleer's testimony regarding Petitioner's actions in the credit union drive-through lane echoed that of Officer Bunch.  (Tr. I, 134-35.)  McAleer was the third or fourth car pursuing Petitioner's silver Pontiac after Petitioner crashed through the snow bank and fled on Lake Lansing Road.  (Tr. I, 135-36.)  After pursuing him down some side streets, McAleer lost Petitioner and randomly drove around in the general area Petitioner was last seen.  (Tr. I, 138.)  McAleer came across Petitioner walking down Detroit Street and, as McAleer drove toward him, Petitioner put his hood up, his hands in his pockets, and looked away from McAleer.  (Tr. I, 138-39, 146-47.)  McAleer saw the vehicle at the end of Detroit Street.  (Tr. I, 139.)  McAleer dispatched the license plate number over his radio, then checked under the car seats for weapons and felt the car's hood, which was still hot.  (Tr. I, 139-40, 152.)  McAleer alerted undercover units in the area, describing Petitioner to them; he then saw Petitioner walk out of the Best Steakhouse and into a nearby gas station.  (Tr. I, 140-42, 149.)  Petitioner had no problems walking when McAleer watched him.  (Tr. I, 144, 149.)  McAleer, a Lansing Township unit, and an undercover unit converged on the gas station, went inside, patted Petitioner down, and asked him his name; Petitioner told them he was "Kenyatta Lee." (Tr. I, 142-43, 150-51.)  Although McAleer had a K-9 Unit dog with him at the time, he did not have the dog "track" Petitioner.  (Tr. I, 144.)  An Officer Beedy arrested Petitioner.  (Tr. I, 150.)  McAleer turned the vehicle over to the Lansing Township officers.  (Tr. I, 151, 152.)  On cross-examination, McAleer admitted that he never saw

- 5 -

the driver of the Grand Am well enough to be able to identify him. (Tr. I, 144-45.) McAleer later stated that there had been a big snowstorm that month, and that the snow was still present on the day Petitioner was arrested. (Trial Tr. Vol. II, 7, docket #16.)

Eaton County Sheriff Deputy Bruce Yelvington testified as follows. In October 2000, Yelvington spoke to Makowski on the telephone, who reported that Petitioner had rented a vehicle in June 2000, and had not yet returned it. (Tr. I, 158, docket #15.) Yelvington left messages for Petitioner via numbers Makowski had given him, but Petitioner never responded. (Tr. I, 158-59.) Yelvington submitted a report to the prosecutor's office. (Tr. I, 159.) During his investigation, Yelvington checked the plates on the rented vehicle; the plates were registered to Enterprise Rent-A-Car. (Tr. I, 159.) The plates on the vehicle that was later recovered by the Lansing Police were registered to a person named Hubargee. (Tr. I, 159.) After Yelvington testified, Petitioner moved for a directed verdict of not guilty, which the court denied. (Tr. I, 165-66.)[3] The prosecution then rested. (Tr. I, 167.)

Petitioner testified as follows. In 1998-99, Petitioner lived with a friend named Shavon Edwards. (Tr. I, 167-68, 170-71.) Edwards resembled Petitioner in that he was only slightly taller, but had a similar complexion, similar facial hair, and the same hair cut. (Tr. I, 177.) During that time, Petitioner did not have a car, and his sources of income were wages from cutting hair, state disability payments, and food stamps. (Tr. I, 168, 171.) Petitioner received state disability payments because he was shot in his legs and an arm in a 1991 robbery. (Tr. I, 169.) His leg injuries prevented him from being able to run and walk up stairs. (Tr. I, 183-84, 188.) Edwards sometimes picked up Petitioner's food stamps after Petitioner taught Edwards how to forge Petitioner's signature on the

_____

[3] I note that pages 161 through 164 are missing from Trial Transcript Volume I.

requisite papers. (Tr. I, 171-72, 195.)  Petitioner never used the Lansing Community Credit Union on Lake Lansing Road; he always used the branch on Pennsylvania Street.   (Tr. I, 173-74.) Sometime in early 2000, when he was living with Edwards, Petitioner applied for a new driver's license at the Secretary of State's Office, but he never received it, and implied that Edwards may have taken it and kept it for himself on one occasion when Petitioner sent Edwards to pick up Petitioner's mail. (Tr. I, 177-78, 195, 203.)  Petitioner had once found mail addressed to a "Shevon Harris" in their shared mailbox. (Tr. I, 195.)  Petitioner was driven various places by Edwards; he had never rented a car, nor had he ever met Makowski at Enterprise Rent-A-Car, or seen the silver Pontiac Grand Am at issue.  (Tr. I, 172, 178, 185, 186-87.)  After about a year of living with Petitioner, Edwards moved out and took a number of Petitioner's belongings with him, including a safe in which Petitioner kept his state disability and other legal papers. (Tr. I, 175.)  Petitioner had bad credit and had not had a credit card in his name since 1995.  (Tr. I, 186-87.)

Petitioner further testified that on the day Petitioner was arrested, Edwards had called Petitioner at home on the telephone and asked him what he was doing. (Tr. I, 179.)  Petitioner told Edwards he was getting ready to go eat at the steakhouse in their neighborhood; Petitioner did not have to tell Edwards where it was located because Edwards had been there before.  (Tr. I, 179-80.) Petitioner, his girlfriend, and her two children drove to the steakhouse in his girlfriend's mother's car.  (Tr. I, 180-81.)  Petitioner's girlfriend immediately went back home because Petitioner had purposely left his cane at home in order to send her for it so that she would not have to be around Edwards.  (Tr. I, 181.)  Petitioner was wearing an orange Nautica shirt, Nautica pants, Timberlane boots, and a black New York Jets football starter coat.  (Tr. I, 181.)  The coat was black with large green lettering and did not have a hood, nor did the Orange Nautica shirt he wore underneath have

a hood. (Tr. I, 181-82.) Petitioner was not wearing a hat. (Tr. I, 182.) After he ordered his food at the steakhouse, Petitioner walked out of the steakhouse to get cigarettes at the gas station nearby; at which time he saw a number of police cars. (Tr. I, 182-83, 189.) Because he was without his cane, Petitioner walked "in increments," stopping every few steps. (Tr. I, 182-83, 185.) Without his cane, it would have taken Petitioner about an hour to walk the five-block distance between Detroit Street to the location of his arrest. (Tr. I, 187-88.)

Petitioner further testified that when he was arrested he told the officers his name was Deja Kenyatta Lee (Tr. I, 184, 185, 189.) He did not know why he was being arrested, had no idea that a rental car agency had reported he failed to return a car, nor had he ever received a telephone call from anyone in which he was told he had failed to return a car. (Tr. I, 184, 185, 189.) When shown the car rental papers bearing his signature at trial, Petitioner testified the signature was his, but he had never seen the papers or signed them. (Tr. I, 184.) Petitioner did not deny that someone committed a crime when they rented a car and failed to return it. (Tr. I, 193.) Rather, Petitioner maintained that Edwards stole his identity by taking Petitioner's driver's license, forged Petitioner's name on the car rental documents, and stole the car. (Tr. I, 193-95.)[4] Petitioner speculated that, given that a car key was found in the steakhouse bathroom, Edwards threw the rental car key into the bathroom and fled. (Tr. I, 199, 202.) On the day Petitioner was arrested, he never saw Edwards. (Tr. I, 202.)

The court certified Dr. George Stilwill as an expert in orthopedic medicine. (Trial Tr. Vol. II, 10, docket #16.) Stilwill testified as follows. On March 24, 1999, he conducted an independent medical evaluation of Petitioner which yielded a number of "objective findings."

---

[4] I note that pages 196 through 198 are missing from Trial Transcript Volume I.

(Tr. II, 10-12.)  Stilwill found the following: a number of scars caused by gunshot wounds and "donor sites" for surgery; "drop-foot" in Petitioner's right foot for which he wore a soft canvas lace-up brace; and a limp due to permanent nerve damage and muscle weakness in his right leg.  (Tr. II, 12-13, 17, 21.)  In Stilwill's opinion, Petitioner could not run because he would fall after two or three steps due to weakness in his quadriceps muscle.  (Tr. II, 13, 18.)  Stilwill further opined that for the same reason, Petitioner would never be able to walk at a normal gait, but could walk with a "deliberate" gait.  (Tr. II, 13.)  After walking for 10 to 15 minutes, Petitioner might have increased instability and knee weakness if his muscles "fatigued out."  (Tr. II, 14, 18.)  Stilwell thought it would be "quite difficult" for Petitioner to walk in the snow, particularly if it was six or more inches deep.  (Tr. II, 14.)  Petitioner could walk with the assistance of a cane or crutches.  (Tr. II, 14.)  Stilwill did not believe Petitioner should climb stairs without a banister, or ladders.  (Tr. II, 14.)  Although Stilwill did not test Petitioner's ability to stoop or squat, he testified it would be limited because of the weakness in Petitioner's right hip and knee, and because of his drop-foot brace.  (Tr. II, 15.)  Without the drop-foot brace on, Petitioner might trip, fall, and/or stub his toe while walking.  (Tr. II, 15.)  Stilwill did not test Petitioner's driving abilities, but opined Petitioner could operate a motor vehicle if he were given some training, because he could not use his right leg effectively, and would have to use his left foot for both the accelerator and brake pedals.  (Tr. II, 15-16.)  Petitioner had a cane when Stilwill examined him.  (Tr. II, 16.)  Stilwill did not review any police reports or past medical records when he conducted his evaluation of Petitioner; nor did Petitioner ever tell Stilwill about the events of the day he was arrested.  (Tr. II, 18-19.)

On cross-examination, Stilwill testified that the drop-foot brace would improve Petitioner's gait, making it look more normal; and that the average person who was not looking for

Petitioner's limp would not be able to see the limp.  (Tr. II, 17.)  Stilwill would not speculate as to

whether, in a life or death situation, Petitioner could walk very fast or at a slow run for a short period

of time.  (Tr. II, 18.)  He did opine that if Petitioner was fleeing the police and had to walk six

blocks, he would not likely be able to cover that distance, and would be "an easy catch."  (Tr. II, 19-

20.)  If the police were merely looking for Petitioner but not chasing him, Stilwill supposed

Petitioner could walk six blocks, depending on the stimulus in Petitioner's "alarm system."  (Tr. II,

20, 22.)  The prosecutor's final question to Stilwill was, "[d]octor, are you familiar with the term

malingering?"  (Tr. II, 20.)  Stilwill responded that it was a "nasty word" he did not like to use, but

that it meant that "somebody's trying to make more of their physical condition than they really

have."  (Tr. II, 20.)  Petitioner rested his case at the conclusion of Stilwill's testimony.  (Tr. II, 22.)

Included in the prosecutor's closing argument and rebuttal closing argument were the

following remarks:

> You only need one witness in this case to convict the
> defendant.  That witness is Angie Makowski.  Angie Makowski
> identified this defendant several times as the one that came into the
> rental car company, signed those contracts, and committed the crime
> that everybody agrees happened.  She ID'd him several times.
>
> . . .
>
> We know that [defendant] was renting multiple cars.  He was going
> through different rental cars.  And if you use your common sense, you
> would agree there's not a whole lot of good reason for going through
> rental cars.  I don't know what he was doing with those rental cars, if
> he was doing good things or he was doing bad things, but he was
> going through rental cars on a monthly, bi-weekly basis.  He would
> take one, he would trade it in, trade in for another one, trade in
> another one.  That's how Angie Makowski got to know him and
> that's how she recognized him.
>
> . . .
>
> [Defendant] came in here and gave you a ridiculous story about an
> alternative identity.

>This case is about fraud.  At this point I think it's really about two different frauds.  It's a fraud that the defendant perpetrated upon Enterprise Rent-A-Car when he took the car and didn't return it.  And we've got another fraud, quite honestly, it's a fraud he's trying to perpetuate upon you, giving you this story that really is not believable and makes no sense whatsoever.
>
>The Judge swore you in and told you your oath was to find what the truth is.  I think the truth here is pretty clear.  Three witnesses came in and said that's the defendant, that's the person I saw, that's the person that was in the car, that's the person that rented the car.  The truth in this case is obvious.  I'm going to ask that you folks take that into account, I'd ask that you folks don't become the second victim in this case, the second victim of fraud.
>
> . . .
>
>If [defendant] comes in here and tells you the truth, then you're going to convict him. Just like kids, adults lie for reasons.  The difference is adults have a lot more practice. [Defendant] has a lot of practice.  He came in, he had a whole big story.  But if you look at the details, the devil's always in the details, it falls apart.  It makes no sense.  And it's even better when you compare that complex story that he gave you, all the ideas, all the ridiculous notions of how people act, you compare that with what Officer McAleer testified to, what officer Bunch testified to, what Angie Makowski testified to.

(Tr. II, 25, 34, 37-38, 51, docket #16.)

Approximately three hours after they retired to deliberate on December 18, 2001, the jury asked the court for help because they felt they were deadlocked and unable to reach a verdict. (Tr. II, 69-70.)  The court convened the jury and instructed them to return to their deliberations and try again to reach a verdict.  (Tr. II, 70.)  About one hour after retiring to deliberate again, the jury returned a verdict of guilty on the count of failure to return rental property valued at $1,000 to $20,000. (Tr. II, 72.)  On January 31, 2002, Petitioner was sentenced to serve a term of 1 year to 7 and one-half years' incarceration, and to pay $5,630 in restitution to the victim and $60 to the Crime Victim Rights Fund.  (Sentencing Transcript (Sent. Tr.), 20, docket #17.)

### B.      Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which was filed by counsel on June 17, 2002, raised only some of the issues raised in this application for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #18.)  Specifically, Petitioner argued to the court of appeals that the prosecutor denigrated Petitioner by calling him a "fraud" and telling the jury not to be another of Petitioner's fraud "victims"; improperly expressed his personal opinion regarding Petitioner's guilt; and improperly vouched for the credibility of his own witnesses. (Def.-Appellant's Br. On Appeal, iii, 10, docket #18).  By unpublished opinion issued on September 11, 2003, the Michigan Court of Appeals rejected Petitioner's prosecutorial misconduct arguments and affirmed Petitioner's conviction and sentence.  (*See* 9/11/03 Mich. Ct. App. Opinion (MCOA Op.), docket #18.)

Petitioner filed a *pro per* application for leave to appeal in the Michigan Supreme Court in November 2003.  He reiterated two of the prosecutorial misconduct claims raised before and rejected by the Michigan Court of Appeals, and added two new issues.  (*See* Def.-Appellant's Pro Per Application for Leave to Appeal, 2-8 and handwritten inserts, docket #19.)  Specifically, Petitioner argued to the state supreme court, as he did before the court of appeals, that the prosecutor improperly expressed his personal opinion regarding Petitioner's guilt and improperly vouched for the credibility of his own witnesses.  (*See id*. at 2-3 and handwritten inserts.)  Petitioner augmented his claim that the prosecutor called him a "fraud" with a new allegation that the prosecutor made improperly misleading, materially false, and inflammatory remarks when he asked Dr. Stilwell the definition of "malingering" and implied that Petitioner lied at trial.  (*See id*. at 7 and handwritten inserts.)  Petitioner also argued, for the first time, that he was denied a fair trial because the

prosecution failed to exercise "due diligence" because it did not investigate Petitioner's claim that someone other than he committed the crime charged.  (*See id.* at 8 and handwritten inserts.)  By order entered February 7, 2004, the Michigan Supreme Court denied Petitioner's application for leave to appeal because it was not persuaded that it should review the questions presented.  (Mich. Order, docket #19.)  Petitioner did not seek review in any other court thereafter.

## Standard of Review

This action is governed by the AEDPA.  *See Penry v. Johnson*, 532 U.S. 782, 791 (2001), *cert. denied, Texas v. Penry*, 126 S. Ct. 2862 (June 12, 2006).  The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey*, 271 F.3d at 655.  This Court also may not consider decisions of lower federal courts in determining whether the state decision is contrary to, or an unreasonable application of, clearly established federal law.

- 13 -

*Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000). Thus, the inquiry is "limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time [the petitioner's] conviction became final." *Onifer v. Tyszkiewicz*, 255 F.3d 313, 318 (6th Cir. 2001).

A decision of the state court may only be overturned if (1) it applies a rule that contradicts the governing law set forth by the Supreme Court, (2) it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at a different result; (3) it identifies the correct governing legal rule from the Supreme Court precedent but unreasonably applies it to the facts of the case; or (4) it either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply or unreasonably refuses to extend a principle to a context where it should apply. *Bailey*, 271 F.3d at 655 (citing *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694; *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003).

A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Williams*, 529 U.S. at 410.

Where the state court has not articulated its reasoning, the federal courts are obligated to conduct an independent review to determine if the state court's result is contrary to federal law, unreasonably applies clearly established law, or is based on an unreasonable determination of the facts in light of the evidence presented. *See Harris*, 212 F.3d at 943; *McKenzie v. Smith*, 326 F.3d

- 14 -

721, 727 (6th Cir. 2003). Where the circumstances suggest that the state court actually considered the issue, the review is not *de novo*. *Onifer*, 255 F.3d at 316. The review remains deferential because the court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *Harris*, 212 F.3d at 943. However, the Sixth Circuit recently has clarified that where the state court clearly did not address the merits of a claim, "there are simply no results, let alone reasoning, to which [the] court can defer." In such circumstances, the court conducts *de novo* review. *McKenzie*, 326 F.3d at 727 (limiting *Harris* to those circumstances in which a result exists to which the federal court may defer); *see also Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing habeas issue *de novo* where state courts had not reached the question); *Maples v. Stegall*, 340 F.3d 433, 437 (6th Cir. 2003) (recognizing that *Wiggins* established *de novo* standard of review for any claim that was not addressed by the state courts).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster*, 324 F.3d at 429; *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state appellate courts, as well as trial courts. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA, I find that Petitioner is not entitled to relief.

<u>Discussion</u>

**A.      Ground I: Prosecutorial Misconduct**

Misconduct by a prosecutor can rise to the level of a due process violation.  The scope of review in a habeas corpus action of prosecutorial misconduct, however, is narrow.  A petitioner must do more than show erroneous conduct.  For relief to be granted, the prosecutorial misconduct must have "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  The Sixth Circuit has expressed "reluctan[ce] to grant habeas petitions based on improper prosecutorial statements at closing argument."  *Wilson v. Mitchell*, 250 F.3d 388, 398 (6th Cir. 2001).  The Court should view any misconduct in closing argument in light of the strength of the competent proofs tending to establish guilt.  *See Angel v. Overburg*, 682 F.2d 605, 608 (6th Cir. 1982) (*en banc*).  "The touchstone of due-process analysis is the fairness of the trial, not the culpability of the prosecutor."  *Serra v. Mich. Dep't of Corr.*, 4 F.3d 1348, 1355 (6th Cir. 1993) (quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982)).  Consequently, the giving of cautionary instructions is relevant to determining whether fundamental fairness was denied.  *Id.* at 1356.

Because Petitioner's prosecutorial misconduct claim is comprised of four distinct alleged improprieties, I will discuss each separately.

1.      <u>"Denigrating" statements that Petitioner was a "fraud"</u>

Petitioner first asserts that the prosecutor improperly denigrated Petitioner by labeling him a "fraud" in his closing argument.  (Pet., ii, docket #1; Pet'r Mem., ii, docket #2.)  The Michigan Court of Appeals held as follows on this claim:

> We review claims of prosecutorial misconduct on a case by case basis.
> *People v Schutte*, 240 Mich App 713, 721; 613 NW2d 370 (2000), citing *People v*

*Kelly*, 231 Mich App 627, 638; 588 NW2d 480 (1998).  Additionally, a defendant must timely and specifically object to prosecutorial comments, or appellate review of the alleged misconduct is precluded.  *People v Rodriguez*, 251 Mich App 10, 30; 650 NW2d 96 (2003), citing *People v Stanaway*, 446 Mich 643, 687; 521 NW2d 557 (1994).  However, if the objection would not have cured the error or a miscarriage of justice would result from failure to review the issue, then this Court may review the claimed error.  *Id*.

Contrary to defendant's claim that during rebuttal argument defense counsel objected to the prosecutor's statements requesting the jury not to be defendant's second victims, no objection by the defense to any prosecutorial statements was made in either the closing or rebuttal arguments.  Thus, we must determine whether an objection would have been futile or if a miscarriage of justice would result without review.  *Rodriguez*, supra at 30.

Defendant first argues that the prosecutor denigrated him by calling him a fraud and asking the jury not to become his second victim.  In his closing argument, the prosecutor stated, "This case is about fraud" and "I'd ask that you folks don't become the second victim in this case, the second victim of fraud."

The defense relies on *Mathis v United States*, 513 A2d 1344 (DC Cir. 1986), where misconduct was found when the prosecutor called the defendant "the Godfather" and the "self-proclaimed Godfather" because the court concluded that such terms had negative connotations and prejudicial overtones.  *Id*.  The defense in the instant case argues that the prosecution's "labeling" of defendant as a fraud invoked negative connotations similar to those found in *Mathis*, as did the prosecutor's argument  that the jury would be the next victim if it was "duped" into believing defendant's story.

We find the instant case distinguishable from *Mathis, supra*.  In the present case, the prosecutor never directly called defendant a fraud but merely referred to his crime against the rental car agency as a fraud.  The prosecutor also never used the inflammatory word "duped," but merely asked the jury not to believe defendant's story and to avoid being a second victim of his fraud.  Because referring to the crime as fraud and asking the jury not to believe defendant's story does not contain improperly prejudicial overtones or evoke negative connotations of the same type found in *Mathis*, defendant's argument fails.

(MCOA Op., 1-2, docket #18.)  Although he did not include the prosecutor's "fraud" remarks in the issue headings of his application for leave to appeal in the Michigan Supreme Court, he did include them in his discussion of his prosecutorial misconduct claim.  (*See* Def.-Appellant's Pro Per

- 17 -

Application for Leave to Appeal, 2 and handwritten inserts pp. 2-4, docket #19.)  The Michigan Supreme Court denied review of the issue.

In noting the state rule that "a defendant must timely and specifically object to prosecutorial comments, or appellate review of the alleged misconduct is precluded," the Michigan Court of Appeals relied on the state's contemporaneous objection rule in assessing this claim.  When a state-law default prevents further state consideration of a federal issue, the federal courts ordinarily are precluded from considering that issue on habeas corpus review.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991); *Engle v. Isaac*, 456 U.S. 107 (1982).  To determine whether a petitioner procedurally defaulted a federal claim in state court, this Court must consider whether: (1) the petitioner failed to comply with an applicable state procedural rule; (2) the last state court rendering judgment on the claim at issue actually enforced the state procedural rule so as to bar that claim; and (3) the state procedural default is an "independent and adequate" state ground properly foreclosing federal habeas review of the federal constitutional claim.  *See Hicks v. Straub,* 377 F.3d 538, 551 (6th Cir. 2004), *cert. denied*, 544 U.S. 928 (2005); *accord Lancaster,* 324 F.3d at 436-37; *Greer v. Mitchell*, 264 F.3d 663, 672 (6th Cir. 2001); *Buell v. Mitchell*, 274 F.3d 337, 348 (6th Cir. 2001). A state procedural rule is independent and adequate if it was "firmly established and regularly followed" at the time of the asserted procedural default.  *Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998) (citing *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991)).

A rule designed to arm trial judges with the information needed to rule reliably "serves a governmental interest of undoubted legitimacy."  *Lee v. Kemna*, 534 U.S. 362, 385 (2002). Petitioner's failure to comply with Michigan's independent and adequate state procedural rule requiring a contemporaneous objection caused him to default his claims in state court.  *See*

- 18 -

*Wainwright v. Sykes*, 433 U.S. 72, 86-88 (1977); *Lancaster*, 324 F.3d at 437; *West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996).

It is clear that the contemporaneous objection rule to statements made in closing argument was well-established at the time of Petitioner's trial. *See, e.g.*, *People v. Stanaway*, 521 N.W.2d 557, 579 (Mich. 1994) (citing cases). Here, after expressly noting Petitioner's default in failing to object to any of the prosecutor's remarks, the Michigan Court of Appeals then reviewed Petitioner's claim to determine whether an objection would have been futile or if a miscarriage of justice would result without review. (MCOA Op., 1-2, docket #18.) The court concluded that neither an error nor a miscarriage of justice occurred. (MCOA Op., 2, docket #18.) This review by the court of appeals was akin to "plain error" or "miscarriage of justice" review, which "does not constitute a waiver of state procedural default rules." *Seymour v. Walker*, 224 F.3d 542 (6th Cir. 2000) (citations omitted); *Scott v. Mitchell*, 209 F.3d 854, 866-68 (6th Cir. 2000); *Atkins v. Phillips*, No. 00-1150, 2000 WL 1720719 (6th Cir. Nov. 8, 2000); *see also  Coe v. Bell*, 161 F.3d 320, 330 (6th Cir. 1998) (state court's alternative holding on the merits does not require federal court to disregard the procedural bar); *McBee v. Abramajtys*, 929 F.2d 264, 267 (6th Cir.1991) (same); *Paprocki v. Foltz*, 869 F.2d 281, 284-85 (6th Cir. 1989) (claim is defaulted even where the state court may excuse the default for "manifest injustice"); *Federico v. Yukins*, No. 93-2424, 1994 WL 601408, at *3-*4 (6th Cir. Nov. 2, 1994) (same, for "miscarriage of justice"). Because this claim is defaulted, review by this court is barred unless Petitioner can demonstrate either: (1) cause for his failure to comply with the state procedural rule and actual prejudice flowing from the violation of federal law alleged in his claim, or (2) that a lack of federal habeas review of the claim will result

- 19 -

in a fundamental miscarriage of justice. *See House v. Bell*, 126 S. Ct. 2064, 2076 (2006); *Murray v. Carrier*, 477 U.S. 478, 495 (1986); *Hicks*, 377 F.3d at 551-52.[5]  He argues neither in his petition.

Notwithstanding Petitioner's default on this claim, this Court may deny it on its merits.  "The U.S. Supreme Court has held that federal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits."  *Hudson v. Jones*, 351 F.3d 212, 215 (6th Cir. 2003), *cert. denied*, 543 U.S. 880 (2004), (citing *Lambrix v. Singletary*, 520 U.S. 518, 525 (1997) ("Judicial economy might counsel giving the [other] question priority, for example, if it were easily resolvable against the habeas petitioner, whereas the procedural-bar issue involved complicated issues of state law.")

The Michigan Court of Appeals decision on this claim was consistent with United States Supreme Court precedent.  In *Darden v. Wainwright,* the Supreme Court assessed a habeas petitioner's claim that he was denied a fair trial by the prosecutor's comments at closing.  *Darden*, 477 U.S. at 178-183.  In closing, the prosecutor: (1) implied that the death penalty would be the only protection against future similar acts by the petitioner; (2) incorporated the petitioner's counsel's use of the word "animal" to describe the petitioner; and (3) made several offensive comments about the petitioner, for example, "[the petitioner] shouldn't be out of his cell unless he has a leash on him"; "I wish someone had blown [the petitioner's] face off"; "I wish [the petitioner] had been killed in the accident."  477 U.S. at 178-80.  The Court noted that, while the comments were "undoubtedly improper," the standard of review for such a claim on habeas corpus is "'the narrow one of due process, not the broad exercise of supervisory power.'" 477 U.S. at 181 (citation omitted).  The

---

[5] The miscarriage-of-justice exception only can be met in an "extraordinary" case where a prisoner asserts a claim of actual innocence based upon new reliable evidence.  *House*, 126 S. Ct. at 2076-78.  Petitioner does not make such an assertion in the present case.

Court held that "[t]he relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id*. The Court concluded that the comments did not deprive the petitioner of a fair trial because they did not manipulate or misstate the evidence; they were largely responsive to the petitioner's closing argument; the court properly instructed the jury that closing was not evidence; and the weight of the evidence against the petitioner was substantial. 477 U.S. at 181-82. The Court agreed with the lower court's ruling that petitioner's trial "'was not perfect – few are – but neither was it fundamentally unfair.'" 477 U.S. at 183.

The Michigan Court of Appeals holding that Petitioner was not denied a fair trial by the prosecutor's statements that Petitioner's trial was about "fraud" and asking the jury not to be the "second victims of fraud" was entirely consistent with *Darden*. The prosecution's "fraud" comments, which I note were not nearly as offensive as those at issue in *Darden*, did not "so infect[] [Petitioner's] trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181 (citation omitted). The Michigan Court of Appeals correctly pointed out that the prosecutor referred to Petitioner's crime – not Petitioner himself – as one of "fraud." (See MCOA Op., 2, docket #18; Tr. II, 24, 37-38, docket #16). Furthermore, the prosecutor's comments did not manipulate or misstate the evidence, and there was ample evidence to support Petitioner's conviction. *See Darden,* 477 U.S. at 181. As a result, this claim is without merit.

    2.    Misleading, materially false, inflammatory statements implying Petitioner lied at trial and had a lot of practice lying

Petitioner next argues that he was denied a fair trial by the prosecutor's misconduct in remarking at closing that (1) Petitioner had a reason to lie at trial; and (2) Petitioner had "a lot of practice" lying. (Pet. Att. A-B, docket #1; Pet'r Mem., Arg A(3), docket #2 (citing Tr. II, 51, docket

- 21 -

#16).) Petitioner argues that, under *People v. Furman*, 404 N.W.2d 246 (Mich. Ct. App. 1987), these errors were "not harmless" because they deprived Petitioner of a "fundamental element of the adversary process" and were "particularly inflammatory." (Pet. Att. A, docket #1.) He claims that the comments surely mislead the jury, and that the state courts erred because they never assessed these remarks to determine whether they were "distinguishable from what was fact or materially false." (Pet. Att. A, docket #1.)

Petitioner raised this particular prosecutorial misconduct claim for the first time in his application for leave to appeal to the Michigan Supreme Court. As a result, this claim is unexhausted. Presentation of an issue for the first time on discretionary review to the state supreme court does not "fairly present" the claim to the state courts for review. *Castille v. Peoples*, 489 U.S. 346, 351 (1989). Applying *Castille*, the Sixth Circuit maintains that a habeas petitioner does not comply with the exhaustion requirement when he fails to raise a claim in the state court of appeals, but raises it for the first time on discretionary appeal to the state's highest court. *See Dunbar v. Pitcher*, No. 98-2068, 2000 WL 179026, at *1 (6th Cir. Feb. 9, 2000); *Miller v. Parker*, No. 99-5007, 1999 WL 1282436, at *2 (6th Cir. Dec. 27, 1999); *Troutman v. Turner*, No. 95-3597, 1995 WL 728182, at *2 (6th Cir. Dec. 7, 1995); *accord Parkhurst v. Shillinger*, 128 F.3d 1366, 1368-70 (10th Cir. 1997); *Ellman v. Davis*, 42 F.3d 144, 148 (2d Cir. 1994); *Cruz v. Warden of Dwight Corr. Ctr.*, 907 F.2d 665, 669 (7th Cir. 1990). Unless the state supreme court actually grants leave to appeal and reviews the issue, it remains unexhausted in the state courts. Petitioner's application for leave to appeal was denied by the Michigan Supreme Court, and, thus, the issue was not reviewed.

Habeas relief on this claim may be denied on the merits, notwithstanding Petitioner's failure to exhaust state-court remedies. *See* 28 U.S.C. § 2254(b)(2). The prosecutor's statement in

- 22 -

closing that Petitioner had a reason to lie at trial did not "so infect[] [Petitioner's] trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181 (citation omitted). The prosecutor did not affirmatively state that Petitioner lied at trial; rather, he implied it, when he pointed out that if Petitioner told the truth, the jury would convict him, therefore Petitioner had a good reason to lie, and that like children, adults sometimes lie to get themselves out of trouble. (Tr. II, 50-51, docket #16.) These comments did not deprive Petitioner of a fair trial or Due Process. *See Darden,* 477 U.S. at 181. They could not have mislead the jury or prejudiced Petitioner. *See Young*, 470 U.S. at 11-12. Furthermore, there was ample competent proof at trial to support Petitioner's conviction. *See Angel,* 682 F.2d at 608.

3.    <u>Vouching for the credibility of prosecution witnesses</u>

Petitioner further claims that the prosecutor improperly "vouched for the credibility of his own witness[es]."[6] (Pet. Att. B, docket #1; Pet'r Mem., ii, Arg. A(1), docket #2.) In support of this assertion, Petitioner cites a legal treatise and the prosecutor's statement during his original closing that, "[y]ou only need one witness in this case to convict the defendant. That witness is Angie Makowski. Angie Makowski identified this defendant several times as the one who came in to the rental car company, signed those contracts, and committed the crime that everybody agreed happened." (Pet'r Mem., Arg. A(1), docket #2 (citing Tr. II, 25-37, docket #16, and 53 AmJur, Trial § 460).) Petitioner also cites the prosecutor's remarks in his original closing that witnesses McAleer and Bunch "proved . . . that [Petitioner] had this extreme audacity to come in here and try to tell you

---

[6] At different times in his application and memorandum in support, Petitioner alternately refers to the prosecution's vouching for its own "witness" and its own "witnesses." (*See* Pet. Att. B, docket #1; Pet'r Mem., ii, Arg. A(1), docket #2.) Because the prosecutor mentioned the testimony of witnesses Makowski, McAleer, and Bunch in his closing arguments (*see* Tr. II, 25-37, 51-52, docket #16), I address this claim as one alleging that the prosecution "vouched" for these three witnesses.

folks some story about mistaken identity, a stolen identity" and Makowski, McAleer, and Bunch

"without any hesitancy . . . pointed to [Petitioner] that he was the one they saw that day." (Pet'r

Mem., Arg. A(1), docket #2 (citing Tr. II, 25-37, docket #16).)

> The Michigan Court of Appeals held as follows with regard to this allegation:
>
>> Defendant next argues that he was denied a fair trial when the prosecutor vouched for the credibility of his own witnesses. Because of the prominence of the prosecutor's office, statements that the prosecutor makes vouching for the credibility of witnesses should be received very cautiously. *People v Erb*, 48 Mich App 622, 631; 211 NW2d 51 (1973). However, the prosecutor is "'free to argue that the evidence shows that the defendant is guilty . . . and he has not only the right but the duty to vigorously argue the people's case.'" *Id*. at 632, quoting *People v Cowell*, 44 Mich App 623, 628-629; 205 NW2d 600 (1973). This Court must examine whether the prosecutor vouched for the defendant's guilt, not whether the jury finds that the prosecutor believes defendant to be guilty. *Id*. In the present case, the prosecutor addressed the truth of his witnesses' testimony only in response to the defense's argument that they were lying; he did not vouch for defendant's guilt.

(MCOA Op., 3, docket #18.) The Michigan Supreme Court denied review of this issue. (*See* Mich.

Order; Def.-Appellant's Pro Per Application for Leave to Appeal, 2 and handwritten inserts, docket

#19.) Petitioner cited to different statements in support of his "vouching" claim before the state

courts. In the court of appeals, he cited remarks in the prosecutor's rebuttal closing only. (Def.-

Appellant's Br. On Appeal, 15-21, docket #18 (citing Tr. II, 50-52, docket #16).) In the Michigan

Supreme Court and in his habeas petition, Petitioner cited statements in the prosecutor's original

closing only. (Def.-Appellant's Pro Per Application for Leave to Appeal, 2 and handwritten inserts,

docket #19; Pet'r Mem., Arg. A(1), docket #2 (citing Tr. II, 25-37, docket #16).) As a result, the

particular statements Petitioner cites from the prosecutor's original closing are technically

unexhausted, but the Court may nevertheless deny habeas on this claim because it is without merit.

*See* 28 U.S.C. § 2254(b)(2).

The federal courts have generally recognized two types of objectionable vouching. In the first type, the prosecutor supports the credibility of a witness by indicating a personal belief in the witness's credibility; via blunt comments that a witness is credible, or statements that imply that the prosecutor has special knowledge of facts not in front of the jury or of the truthfulness of the witness. *United States v. Francis*, 170 F.3d 546, 550 (6th Cir. 1999); *United States v. Carroll*, 26 F.3d 1380, 1388-89 (6th Cir. 1994); *United States v. Krebs*, 788 F.2d 1166, 1176 (6th Cir.1986) (quoting *United States v. Daniels*, 528 F.2d 705, 709 (6th Cir.1976)); *Drew v. Collins*, 964 F.2d 411, 419 (5th Cir. 1992). In the second type of vouching, known as "bolstering," the prosecutor invites the jury to believe that there is other evidence, known to the prosecutor but not introduced into evidence, corroborating a particular witness' testimony. *See Francis*, 170 F.3d at 551. The Sixth Circuit has stated that it has "not discovered . . . any cases in which we have granted habeas relief on the basis of improper vouching." *Id.* at 536. Rather, the "few cases in which vouching provided a basis for relief were in the context of a direct appeal where we exercise supervisory power over the federal trial court proceeding." *Id.*

Petitioner's vouching claim does not meet the high standard to establish a due process violation. The prosecutor did not engage in either type of impermissible vouching in his original or rebuttal closing arguments. In his original closing, the prosecutor summarized the testimony of Angie Makowski, noting her testimony that she'd identified this defendant several times. (Tr. II, 25, 26, docket #16.) The prosecutor's recapping Makowski's testimony in his closing did not "infect[] [Petitioner's] trial with unfairness as to make the resulting conviction a denial of due process.'" *See Darden,* 477 U.S. at 181. Neither did the prosecutor's statement that the jury only "need[ed] one witness in this case to convict the defendant," which was a mere invitation to the jury to recall

- 25 -

Makowski's testimony that Petitioner was the perpetrator of this crime, infect Petitioner's trial with any unfairness at all.  *See id.*  In his original closing the prosecutor also pointed out that the testimony of witnesses McAleer and Bunch contradicted Petitioner's testimony that someone else committed the crime in Petitioner's name, characterizing Petitioner's use of the stolen identity theory as "audaci[ous]."  (Tr. II, 26, 31, 33, docket #16.)   The prosecutor summarized the testimony of Makowski, McAleer, and Bunch with a statement regarding their credibility in relation to Petitioner's at trial: "Angie Makowski, Officer McAleer, Officer Bunch, all three of them without any hesitancy, without any question pointed to this defendant that he was the one they saw that day.  The defendant comes to you with some ridiculous story about mistake in identity in the face of that."  (Tr. II, 33, docket #16.)  This statement was permissible because it was directed towards convincing the jury that Makowski, McAleer, and Bunch were more credible than Petitioner.  It is appropriate for the prosecutor to invite the jury to examine the testimony they have heard at trial, draw reasonable inferences, and examine the motives witnesses may have for lying.  *See Cantrell v. Gray*, No. 84-3686, 1986 WL 16540, at *3 (6th Cir. Feb. 7, 1986); *see also United States v. Eltayib*, 88 F.3d 157, 173 (2d Cir. 1986); *Rodriguez v. Peters*, 63 F.3d 546, 564 (7th Cir. 1995); *Kappos v. Hanks*, 54 F.3d 365, 368 (7th Cir. 1995).   The Michigan Court of Appeals correctly found that the prosecutor's statements as to the credibility of Makowski, McAleer, and Bunch in his rebuttal closing (*See* Tr. II, 50-52, docket #16), were not objectionable because they were in response to Petitioner's comments in his closing that those witnesses had reasons to lie.  (*See* MCOA Op., 3, docket #18),  *See also Darden*, 477 U.S. at 182.

Additionally, a jury instruction that lawyers' arguments are not evidence has been deemed to cure any improprieties in a closing argument.  *Byrd v. Collins,* 209 F.3d 486, 538 (6th Cir.

2000).  Instructing the jury regarding the methods it should use to evaluate credibility also helps to

cure any improprieties.  *Id*.  In this action, the court gave both kinds of instructions.  It instructed the

jury that "[t]he lawyers' statements and arguments are not evidence" and "[y]ou should only accept

things the lawyers say that are supported by the evidence or by your own common sense and general

knowledge."  (*See* Tr. II, 54-55, docket #16.)  The court also advised the jury on methods to use to

evaluate credibility.  (Tr. II, 56-58, docket #16.)  Consequently, Petitioner's vouching claim does not

rise to the constitutional level.

### 4.     Expressing his personal opinion that Petitioner was guilty

Petitioner argues that the prosecutor improperly "stated his personal opinion regarding

[Petitioner's] guilt."  (Pet. Att. B, docket #1; Pet'r Mem., ii, Arg. A(2), docket #2.)  In support of this

claim, Petitioner cites a number of treatises and the prosecutor's remarks in closing that: (1) the

"fictional person" Petitioner claimed was the real perpetrator acted in ways that were "incredible,"

"not believable," and "ridiculous"; (2) it was "awfully convenient" that Petitioner claimed to have

been "dropped off" at the steakhouse on the day of the arrest; and (3) everything "caved in" and "fell

apart" on Petitioner the day he was arrested, after he'd been "renting multiple cars."  (Pet'r Mem.,

Arg. A(2), docket #2 (citing Tr. II, 28-35, docket #16).)

The Michigan Court of Appeals held as follows with regard to this claim:

> Defendant next argues that he was denied a fair trial when the prosecutor
> stated his personal opinion regarding defendant's guilt.  Generally, "the prosecuting
> attorney should be permitted to argue the testimony, but has no right to state what he
> personally thinks or believes of defendant's guilt, except as shown by proof."  *People
> v Slater*, 21 Mich App 561, 566; 175 NW2d 786 (1970).  "A prosecutor may properly
> respond to issues previously raised by a defense counsel."  *People v Modelski*, 164
> Mich App 337, 348; 416 NW2d 708 (1987).
>
> In his closing argument, defense counsel stated that the rental car manager had
> many reasons to lie,  pointed out documents that she did not provide, and then implied

that regardless who was tried, she would testify that was the person who rented the car to save her job.  In rebuttal, the prosecutor responded by telling the jury that the manager had no reason to lie and that she had adequately explained why many of the documents the defense referenced were not available.  Because the prosecution's remarks were made in response to issues raised by the defense, defendant's argument is without merit.  See *Id.*

(MCOA Op., 2, docket #18.)  The Michigan Supreme Court denied review of this issue.  (*See* Mich. Order; Def.-Appellant's Pro Per Application for Leave to Appeal, 3 and handwritten inserts, docket #19.)

While there is some overlap, Petitioner raised different statements by the prosecutor to support his "opinion" claim before the state courts than he does in his habeas petition.  In the court of appeals, Petitioner cited the prosecutor's statements in his rebuttal closing that witness Makowski was truthful, had no reason to lie, and that Petitioner had a reason to lie.  (Def.-Appellant's Br. on Appeal, 15-16, docket #18 (citing Tr. II, 50-52, docket #16); MCOA Op., 2, docket #18.)  Petitioner also raised, although the court of appeals did not address them, the prosecutor's statements in his original closing that the real perpetrator as described by Petitioner acted in ways that were highly implausible.  (Def.-Appellant's Br. on Appeal, 17, docket #18 (citing Tr. II, 26-30, docket #16).)  In his appeal to the Michigan Supreme Court, Petitioner cited the prosecutor's comments in his original closing that the purported real perpetrator acted in ways that were implausible.  (Def.-Appellant's Pro Per Application for Leave to Appeal, 3 and handwritten inserts, docket #19 (citing Tr. II, 28-35, docket #16).)   In his habeas application, Petitioner cites the prosecutor's statements during his original closing that the real perpetrator acted in ways that were highly implausible; it was convenient Petitioner claimed to have been "dropped off" at the steakhouse; and everything "fell apart" on Petitioner after he'd spent months "renting multiple cars."  (Pet'r Mem., Arg. A(2), docket #2 (citing Tr. II, 28-35, docket #16).)   Because Petitioner raised the original closing statements before the

Michigan Court of Appeals and the Michigan Supreme Court, I will assess this ground as if it is exhausted despite the fact that the Michigan Court of Appeals did not address this particular allegation.

As is vouching for prosecution witnesses, a prosecutor's expression of his personal opinion concerning a defendant's guilt is prohibited. *Krebs*, 788 F.2d at 1176. However, this Court's inquiry is limited to determining only whether the improper comments constitute a due process violation. *Darden,* 477 U.S. at 181, *Byrd,* 209 F.3d at 529, 536. The prosecutor's comments that Petitioner had a reason to lie, the real perpetrator acted in ways that were "ridiculous," it was "convenient" that Petitioner claimed to have been "dropped off" at the steakhouse, and everything "fell apart" on Petitioner after he'd spent months "renting multiple cars" did not "so infect[] [Petitioner's] trial with unfairness as to make the resulting conviction a denial of due process." *See Darden*, 477 U.S. at 181. I find that these statements entailed an invitation to the jury to evaluate Petitioner's credibility and a summation of the evidence pointing to Petitioner's guilt; habeas relief is therefore not warranted on this claim.

### B.      Ground II: Prosecution's Failure to Exercise "Due Diligence"

Petitioner claims that his conviction was "obtained by the prosecutor's failure to exercise the procedure of Due Diligence, resulting in plain error and a miscarriage of justice." (Pet. Atts. B-D, docket #1; Pet'r Mem., ii, Arg. A(3), docket #2.) Although not entirely clear, it appears that Petitioner is alleging that the prosecution failed to sufficiently investigate Petitioner's theory that Shavon Edwards rented a car in Petitioner's name, failed to return it, and therefore committed the crime for which Petitioner was convicted. (*See* Pet. Atts. B-D, docket #1 (citing Tr. 1, 193-94, 197, docket #15); Sent. Tr., 15-16, docket #17.) In support of this ground, Petitioner cites his own trial

testimony that Shavon Edwards befriended Petitioner, knew how to sign Petitioner's name, and stole the rental car in Petitioner's name. (Pet. Atts. C-D, docket #1 (citing Tr. I, 193-94, 197, docket #15).)

Petitioner raised Ground II for the first time in his application for leave to appeal to the Michigan Supreme Court. (*See* Def.-Appellant's Br. on Appeal, iii, docket #18; Def.-Appellant's Pro Per Application for Leave to Appeal, 8 and handwritten inserts, docket #19.)  The claim is therefore unexhausted. *See Castille,* 489 U.S. at 351; *Dunbar,* 2000 WL 179026, at *1; *Miller,* 1999 WL 1282436, at *2.  Because Petitioner's application for leave to appeal was denied by the Michigan Supreme Court, the issue was not reviewed.

Habeas relief on Ground II may be denied on the merits, notwithstanding Petitioner's failure to exhaust state court remedies. *See* 28 U.S.C. § 2254(b)(2).  Petitioner does not – and cannot – cite any federal authority to support his contention that a prosecutor is obligated to investigate or develop exculpatory evidence.  A state prosecutor is only obligated under the United States Constitution to disclose to a defendant exculpatory evidence of which he is aware. *Brady v. Maryland,* 373 U.S. 83, 87 (1963).  There is no corresponding constitutional duty to fully investigate a defendant's theory of the crime or to seek out such evidence.  Even under state-law principles, neither the prosecutor nor the police have an affirmative duty to investigate on a defendant's behalf, or to seek and find exculpatory evidence. *People v. Burwick*, 537 N.W.2d 813, 816 n.10 (Mich. 1995); *People v. Sawyer*, 564 N.W.2d 62, 65 (Mich. Ct. App. 1997).  Based on the foregoing, the prosecutor was not required to pursue Petitioner's claim that Shavon Edwards stole Petitioner's identity and committed the crime for which Petitioner was convicted.  I therefore recommend that the Court deny habeas relief on Ground II because it is meritless.

- 30 -

C.      **Ground III: Trial Court's "Erroneous Assessment" That Resulted in a "Manifest Constitutional Error" and a "Miscarriage of Justice"**

Petitioner lastly claims, in a rather incoherent manner, that his conviction was "obtained by an erroneous assessment made by the Judge which resulted in a Manifest Constitutional Error that consequently ended with a Miscarriage of Justice." (Pet. Atts. C-D, docket #1.)  In support of this ground, Petitioner cites three things: (1) the court's pre-trial granting of Petitioner's motion to preclude any reference to his prior armed robbery conviction (Pet. Atts. C-D, docket #1 (citing Tr. I, 3-4, docket #15)); (2) the court's denial of Petitioner's motion for a directed verdict of acquittal based on the prosecution's failure to show that the car was contractually due back to Enterprise on a certain date (Pet. Atts. C-D, docket #1 (citing Tr. I, 166)); and (3) the trial court's ruling at sentencing that Petitioner was not denied a fair trial, after Petitioner had argued that neither his attorney nor the police pursued Petitioner's stolen identity theory as extensively as Petitioner wanted them to.  (Pet. Atts. C-D, docket #1 (citing Sent. Tr., 15-20, docket #17).)

Ground III is unexhausted.  Petitioner raises this brand-new claim for the first time in his habeas petition, thus, it was not fairly presented to the state courts and is unexhausted.  *See Castille,* 489 U.S. at 351; *Dunbar,* 2000 WL 179026, at *1; *Miller,* 1999 WL 1282436, at *2.  The Court may nevertheless deny habeas relief on Ground III because it is meritless.  *See* 28 U.S.C. § 2254(b)(2).

As an initial matter, it is unclear why Petitioner seeks habeas relief based on the trial court's granting of his motion to preclude reference to his prior conviction, as the ruling was to Petitioner's benefit.  I will thus not further address this claim.  Petitioner's claim that the trial court erred when it denied his motion for a directed verdict is a matter of state law regarding the weight of the evidence, not its sufficiency, and is therefore non-cognizable in a habeas petition.  *Cameron v.*

- 31 -

*Birkett*, 348 F.Supp.2d 825, 838 (E.D. Mich. 2004) (citing *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).  Even if Petitioner had raised a sufficiency of the evidence claim, it would nevertheless fail because the evidence was more than ample to support Petitioner's conviction.  *See Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Petitioner's claim that he was denied due process because the prosecutor did not investigate Petitioner's stolen identity claim is meritless because the prosecutor was under no obligation to do so.  *See* Section B, above (discussion of Ground II.)  Finally, Petitioner's claim that he was denied due process because his trial counsel did not pursue or present the stolen identity defense in the precise manner Petitioner preferred is also meritless.  Trial counsel did, in fact, thoroughly present the mistaken identity theory at trial as Petitioner's main defense. Accordingly, I recommend that habeas relief be denied on Ground III.

### Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.


Date:  January 25, 2007                             /s/ Ellen S. Carmody
                                                   ELLEN S. CARMODY
                                                   United States Magistrate Judge


### NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within ten days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).